And we move to the second case this morning, which is Planned Parenthood of Indiana and Kentucky versus the Commissioner of Indiana Department of Health. Mr. Fisher. Thank you, Your Honor. May it please the court. We appeal the preliminary injunction in this abortion regulation case to confirm definitively the party's burdens before proceeding to final judgment. In that regard, the challenge for the court in this case is to reconcile whole women's health with Casey's approval of informed consent and waiting period requirements as permissible means of persuading women against abortion. The way to reconcile General Fisher, I'm going to start you right out if I might. Sure. How do you reconcile the argument that an ultrasound is essential for informed consent with the fact that the law does not require women to view it at all? I think, Your Honor, that there is information that comes from the ultrasound that even Planned Parenthood's doctors would acknowledge is relevant, regardless whether the woman chooses to view it or listen to it. You know, in the brief, you do say several times that the ultrasound provides more complete information to a woman, but you also have acknowledged that women can be given all the same information about fetal development by seeing photographs or even videos of fetuses. But as you say on page four of your brief, the ultrasounds are uniquely impactful because they allow the herpes. So is the ultrasound really supplying any more medical information or is it supplying or increasing an emotional reaction? Well, I think there's two components to that. I don't want to disclaim that there's any medical information, but I do acknowledge that the It is part of the effort of the state to persuade the mother against abortion, just as all of the other information in that list, or much of it anyway, is designed to do that. And that's exactly what Casey says we can do and what this Court in Carlin and A Woman's Choice said that we are permitted to do. But you see, the problem here, it seems to me, is the burden on a woman, for instance, a woman in Fort Wayne who has to drive 400 miles twice now, twice, to complete the procedure. And that's very burdensome, particularly on these part, are very, very low income women. Okay. Well, I guess I would respond first by going back to Casey, Carlin, and A Woman's Choice, all of which acknowledged that increased driving distances can be burdensome, but those are not undue burdens in and of themselves. Now, that doesn't mean that there is no opportunity to challenge a law such as this based on that after the law has been given a reasonable opportunity to go into effect so that that impact can be measured reasonably. And that's the holding of A Woman's Choice. And there's nothing in Whole Women's Health that requires lower courts to go back and revisit those kinds of holdings. Whole Women's Health really was doing for the first time with respect to laws directed at protecting the mother's health what Casey had already done with respect to informed consent. So we think this fits squarely within that Casey model, and there's no reason to think that increased driving distances are more relevant for this kind of early enforcement challenge than they were in any of the other informed consent cases. Let me explain what I find odd about the arguments. I find it odd that the State thinks that the burdens that the State put there should be lessened by having the State micromanage how Planned Parenthood runs its clinics. The State says that Planned Parenthood should buy more ultrasound equipment, buy cheaper and less reliable equipment, pay for overtime to have longer work days, train nurses to read the ultrasounds, move resources from gynecological care to abortion care. Why should it fall upon Planned Parenthood to lighten the burden that the State has imposed on a constitutional right to an abortion? Look, we may all agree that abortion should, or we may not agree, or you know, that abortion should be a legal right, but surely, you know, the State understands that women have this constitutional right to an abortion without all these burdens. Well, yes, but of course these are exactly the same points that were brought up in A Carlin and Casey. The idea that there might be an adaptation by the abortion providers is a reasonable thing to expect, and indeed, if we look at the experience of Planned Parenthood since the Indiana in-person counseling requirement was finally permitted to go into force in 2003, Planned Parenthood adapted. They adapted to that new environment. They began permitting in-person counseling at health centers, not simply at their abortion clinics, so that the prediction of too long trips to the abortion clinic never really came to fruition. Now, they also adapted their... Here at will. Here at will. You know, at one point, it seems that the State is saying that Planned Parenthood should reallocate its resources from other wellness care so that it can provide more abortion ultrasounds. That's a very odd argument for a state that wishes to reduce abortion because taking resources from the contraception services will surely increase and not reduce abortions. Well I think... I fear that you are going to increase abortions. I understand the point that you're making, I think. My response is these are legislative policy judgments, and if that in fact happens to be the result of this law, that is something the legislature can take into account. It's not a reason to second guess what the legislature has done before the law has even permitted a reasonable period of enforcement. These are all, again, the same kinds of arguments that were insufficient to carry the day in A Woman's Choice, in Carlin, and in Casey. And all we're seeking here is essentially the same methodological treatment for this law that our informed consent laws received in A Woman's Choice. So I think there is a huge difference here between what the legislature is able to do on a theoretical level versus in the context of when it is purposefully or purportedly trying to promote the physical health of the woman, which is what Whole Women's Health was about. Casey spoke entirely in terms of the theoretical justification for informed consent laws. It didn't require any kind of proof up front as to what the effect would be. It didn't even require any particular demonstration of anything beyond sort of a common sense plausible understanding of what information in waiting periods might have on the woman's decision. And so we are well within that tradition when it comes to moving the ultrasound from the day of the abortion to 18 hours in advance. You're arguing that rather than having the law enjoined pending a full outcome, that as a temporary measure, Planned Parenthood should just buy ultrasound equipment for its remaining 11 clinics at the cost of $25,000 a piece. How can that be reasonable? What will Planned Parenthood do with the ultrasound machines if the law is permanently enjoined? And where are they supposed to get the money? Not the state. Are you? No. I think you cut out just a little bit, Your Honor. I want to make sure I understand. But the problem is we can't know the constitutionally relevant facts about this law unless it is permitted to go into effect for a reasonable amount of time. Planned Parenthood says it has to spend $25,000 on machines. Well, those are because it wants the most optimal machines it can think of. It can cover those needs for far less money. It doesn't need to buy as many as 11 or however many you suggested. It can cover the demand. There are a lot of clinics that will need ultrasound machines. And who wants to use them? Really, I know I'm not supposed to bring you and me into it, but I'm not going anywhere where they have cheap equipment. Well, Your Honor, the point is they need to make, if this law is permitted to go into effect, they will have to make some business judgments about what resources to bring to bear on this. Where is the demand? Do they really need 11 machines or can they satisfy the demand with fewer? And can they satisfy the requirements of the statute? That's what a full hearing is for. Well, now wait a minute. What I started off by saying was that the need for the period of enforcement is to permit collection of the constitutionally relevant facts, which is the effect of the law on availability of abortion as enforced. And we don't have that time period here. We have four months during which, at most, Planned Parenthood heard from nine women who were burdened by this law. That, I think, is not a sufficient amount of time or a statistically relevant sample to have any idea of what the impact is likely to be. I did want to say something about the district court's observation about what the relevant universe of women is in this context. And I have to confess, I'm not entirely sure that it's relevant to the constitutional analysis, but it really wasn't addressed in the briefs. And so I wanted to just bring it to the court's attention. The district court, in relying on Casey or citing Casey, talked about the need to examine the effect of the law on the women to whom it was relevant. Our view here is that this law has a regulatory impact on all women seeking abortions. It's not like the spousal notice provision in Casey where the regulatory impact was only on women who would not otherwise tell their husbands. And you could then measure the impact on that sub-universe. The district court here, I think, was of the view that the relevant universe was only women who were low income, for lack of a better term. She may have put it in slightly different terms. But I don't think it's fair to say that the constitutionality of this law can be measured only by its impact on some subgroup of women seeking abortions based only on socioeconomic status. I think it has to be viewed in the overall context, since it is all women who are regulatorily impacted by this law. So I just wanted to put that out there because I think that was not something we addressed thoroughly in the briefs. Finally, I just want to say, in Carlin, this court was trying to understand the undue burden standard. And what it came up with was the idea is let's take a look at Casey in the informed consent context and see how Casey handled the idea of undue burden in the informed consent context. And that's all we're asking the court to do here, is to go back and look at Casey, understand that this is of a piece with Casey, and we are entitled to the same methodological treatment as our other informed consent requirements. I'll reserve the remainder of my time. Thank you. Thank you, Mr. Fisher. Mr. Falk. May it please the court. Casey and Whole Woman's Health require that a court weigh the accumulated burdens imposed by an abortion regulation and balance it against the state's interest. And that's precisely what this court alluded to in Carlin. In Carlin, of course, the court found although a 24-hour waiting period requiring two trips was found not to be an undue burden in Casey, and I'm quoting from the opinion, a similar provision in another state's abortion statute could well be found to impose an undue burden on women in that state depending on the interplay of factors. Similarly, in A Woman's Choice, this court found that there were no facts because it was pre-enforcement, but again alluded to the fact that facts make the difference. Whole Woman's Health specifically noted that increased driving distances do not necessarily show an undue burden, but they can when taken together with other factors. And this court in Van Hollen said, quote, when one abortion regulation compounds the effects of another, the aggregate effects of abortion rights must be considered. The district court... Mr. Falk, what is the maximum distance any woman has to travel for an ultrasound at one of the Planned Parenthood centers in Indiana that provide it? We were using Fort Wayne as an example. There are areas a little bit to the north of Fort Maryville or Mishawaka, which is where the figure came that the district court used of 400 miles to make the two trips. 400 miles from Fort Wayne? No, no, to make two trips back and forth. 200 round trip back and forth, two times. 100 miles one way. Yes, I'm sorry. And what the evidence shows, and the state argues that there should be a reasonable opportunity to collect facts, well, the law was in effect for a brief period before the preliminary injunction, and the evidence shows that during that brief period, women were not able to get abortions. Oh, okay. The law went into effect July 1st. The injunction hearing was November 9th. The injunction was issued at the beginning of this year, but the evidence basically closed. The first affidavit showing, I believe, seven or more women was a month after the fact, and then there was a supplemental affidavit a few weeks prior to the hearing. So there was evidence, and the evidence demonstrated that what happened is that the ultrasound appointments were concentrated in a few centers. Women would call in, and we have statistics showing that a large percentage of women, because of the rather brief time period in Indiana to obtain an abortion, don't find out about their pregnancy, don't make arrangements towards the end of that period. Women called in, were told, we don't have appointments. You can't be seen in time. Also because of the travel, women were not able to arrange for things like childcare. They could not get off work. They simply could not make the arrangements necessary for travel. We have an affidavit from Dr. Collins who indicated that due to the low and lower income nature of the majority of Planned Parenthood patients, the added cost of travel, not just the gasoline expense, but missing work for two days, having to arrange childcare, those expenses were sufficient to stop women from being able to get an abortion. Therefore, the fact-based analysis that is required by Whole Woman's Health, and Casey says, well, what does the state have? What is the state's interest? And how is that interest served? And the issue here is not whether an ultrasound requirement further the state's interest. The question is, given that there's been an ultrasound requirement for years, the question is, what benefit to the state's interest is moving that requirement 18 hours? How does that affect the state's interest? As the district court noted, in Whole Woman's Health, the court looked to not just what is the regulation in Texas, but what is the justification for changing the existing regulations? And there you run into problems, because as Judge Rovner noted, there's no requirement that women even view the ultrasound. Most women do not. And the evidence is that there's a great deal of decisional certainty among women getting abortions. Therefore, the ultrasound really doesn't do any good in terms of dissuasion. And the only evidence, the only evidence the state has, to the contrary, is one statement in one affidavit from a doctor who said that she had a patient who had obtained an abortion from Planned Parenthood, had not viewed the ultrasound, but that if she had had 18 hours, she likely would have and she might have changed her mind. The district court... Is it medically necessary to perform an ultrasound before a medical termination? There is evidence that it is not absolutely necessary. Planned Parenthood does it for medical reasons so that they can make sure of fetal, embryonic and fetal age, and also to make sure that it's an intrauterine pregnancy. But that does not have to be done until the time of the procedure. In fact, one of the drawbacks of doing it more than 18 hours beforehand is that at Planned Parenthood, the doctor is not around when the ultrasound is done. The doctor is there at the time of the abortion and the doctor might very well want to do another ultrasound. So we have to separate the medical reason from the state's interest. And the state's interest is somehow using that to dissuade women. And one would think that given how long the ultrasound has been a feature of Indiana law in this regard, that if the state thought that was a legitimate reason, the state would have evidence. But we see absolutely no evidence. And we see a lot of evidence of burden. And this court was quite clear in Schimel, if the burden significantly exceeds what is necessary to advance the state's interest, that is an undue burden. And that's exactly what we have here. This is not a situation like a woman's choice where there was no evidence in the record, where the court criticized the district court for relying on unreliable out-of-state studies that really did not apply to Indiana. We know what happened in the month or so after this law was enacted. Women were not able to obtain abortions. Women were adversely affected. And under the evidence-based balancing test that Casey and Whole Woman Health require, that demonstrates an undue burden. And the state would have it differently, but we know what the facts pointed to. And we know that there's nothing in this record to demonstrate a support for the state's interest. Do you know how many other medical reasons, other than abortion, Planned Parenthood uses its ultrasound machines for? I do not, Your Honor. And it is not part of the record, and I do not even know outside of the record, so I would not even venture an extra record guess. I know that Planned Parenthood sees both men and women for a full range of reproductive health issues. I'm just not sure. And that's, of course, part of the reason why it makes no sense for the state to be trying to reorder how Planned Parenthood operates. Only 7% of Planned Parenthood's patients receive abortions. So to say to Planned Parenthood, you should take away from that 93% and do X, Y, or Z, not only makes no sense, it's not recognized by the case law. There is no case law where a court gets down in the weeds like that in analyzing undue burden. Undue burden is a function of what are the burdens and what is the justification. How does this support the state's interest? Where's Planned Parenthood funding come from? For abortions, it's all private, Your Honor. For that 7%, that is all private. For abortions, it's all private? Yes. There may be some insurance companies that pay for abortions, private insurance. I'm not aware of any. And most of the women that come to see, most of the women that come to Planned Parenthood are the lowest economic rung of our society. That is correct. And that is why when we have, when we are factoring in things like travel, things like work, people think, I miss work, I have a sick day. But of course, when you're a low-wage job, a fast-food job, you don't have sick days. The evidence shows that a number of the women called in and said they had just started work, they weren't able to miss work, and therefore, they might be able to reorganize their life, I assume, to make one lengthy trip. Does that have to do with they're just about ready to give birth and they're going to miss work? I mean, that doesn't make much sense. I do not know what places do that do not provide sick days for people who give birth. And I do not know what the context of federal law is to protect a mother in that situation. I do know, however, that there's no requirement that sick days be given to low-income jobs. And that is, as you can see from the record in this case, that is a clear impediment to women being able to miss that work to get an abortion. I believe that the evidence shows that one woman indicated that it had been a year since she had gotten a job. And at this point, she simply could not handle the lengthy travel to get both the ultrasound and the abortion. But naturally, she would be, at least several days, not be able to go to work during the birth of the child. That's correct. And again, and I apologize for my ignorance of federal law protecting women who give birth. That might very well cover all employers. But there is not a similar coverage, as I understand it, otherwise. And remember, Your Honor, the district court made factual findings. And we're talking about whether those are clearly erroneous. And there is little or no evidence to challenge those factual findings, let alone to show they are clearly erroneous. Again, this is a case that requires fact-based balancing. That's exactly what the district court did. The district court said, here is what I think the burdens are. Here is what I think the benefits are. Here is why I think the burdens greatly outweigh the benefits. That is the textbook definition of undue burden. And for this reason, the district court should be affirmed. Thank you. Thank you, counsel. Mr. Fisher, how much time? You have five minutes, Mr. Fisher. Thank you, Your Honor. Just a couple of brief points. First of all, when Casey spoke of validating abortion regulations, including informed consent regulations, under the undue burden standard, it spoke in terms of what would amount to a large fraction, erecting an obstacle for a large fraction of women who would seek an abortion. Mr. Falk referred to, as I had, that there is at most testimony about nine women who had experienced burdens based on the time period after this law became effective. There is, however, no confirmation that those women never received abortions. There is only, I think, an assumption that they didn't, given the experience they had with Planned Parenthood. Beyond that General Fisher, suppose the State adds the early ultrasound requirement, and next year the State adds a requirement that the ultrasound be 3D, and the following year that only doctors can perform the ultrasound. Each regulation will only impose a minor or perhaps incidental increased burden on a woman's right to terminate. But why can't a court assess these cumulative burdens as a whole, since the cumulative burden is what prevents a woman from exercising her right, her constitutional right to have an abortion? The answer, Your Honor, is that of course a court can do that, but not before a reasonable period of enforcement, so that proper account can be taken of the impact of the accumulated burdens. Here, indeed, what Mr. Falk acknowledges is that seven of the nine women who supposedly had these obstacles, they learned about it within the first month that the law went into effect. And over the remaining two or three or four months, or however many it was, that the law was effective, only three more were they able to document, which, if it suggests anything, suggests better ability of everyone to cope with the new regulation over time. But this is all a bit premature, of course, because there is no reasonable amount of time in play here where we can meaningfully gauge the impact of this law, and that's how we would assess those accumulated burdens. And I think in terms of the justification for the law, there's nothing wrong with the legislature operating at the theoretical level, as Casey permitted. So putting this requirement 18 hours ahead of the abortion may prompt more women to look at the ultrasound, to listen to the fetal heart tone, to have a reaction to that, and to be persuaded against the abortion. And that's exactly the kind of thing that we are well within that here. There's nothing else. Thank you. Thank you. Thanks to both counsel, and the case is taken under advisement.